# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.   1:16-cv-00847

UNITED STATES OF AMERICA,

    and

THE STATE OF COLORADO,

       Plaintiffs,

    v.

COCA MINES, INC.

       Defendant

_____

# COMPLAINT
_____

Plaintiffs, the United States of America, by authority of the Attorney General of the United States and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Colorado, on behalf of the Colorado Department of Public Health and Environment ("CDPHE"), allege as follows:

## NATURE OF ACTION

1.    This is a civil action under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9607, for the recovery of costs incurred by the United States in response to the release or threatened release of hazardous substances at the Nelson Tunnel/Commodore Waste Rock Pile Superfund Site (the "Site") located near the statutory town of Creede in Mineral County, Colorado. The United States and the State of Colorado also seek a declaration of liability against

1

CoCa Mines, Inc. pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 113(g)(2), that will be binding in future actions to recover further response costs or damages incurred by the United States and the State of Colorado in connection with the Site.

## JURISDICTION AND VENUE

2.      This court has jurisdiction over this action and the parties hereto, pursuant to Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b); 28 U.S.C. §§ 1331, 1345 and 1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c), and 42 U.S.C. §§ 9607(a) and 9613(b), because the releases or threatened releases of hazardous substances that gave rise to the claim in this action occurred in this district and because the Site is located in this district.

## SITE DESCRIPTION AND BACKGROUND

4.      The Site is located in the San Juan Mountains about 1.5 miles north of the statutory town of Creede in Mineral County, Colorado near the bottom of a steep canyon with nearly vertical (~ 60% gradient) walls.  The Site encompasses part of the historic Creede Mining District extensively mined, primarily for silver, beginning in 1889 and continuing through the 1980s.  Several hard rock mines, including the Commodore, Amethyst, Park Regent, Happy Thought, and Chance, mined silver from fissure veins.  Mine shafts reached down from the surface of the mountain sides to a rich silver vein named the "Amethyst Vein" because of an abundance of amethyst crystals co-located with the ore.  The mine workings were also accessed horizontally by mine adits, including the Nelson Tunnel and the Commodore No. 5 Tunnel described below.  The Site includes the abandoned Nelson Tunnel and its associated discharge of acid mine drainage, and a waste rock pile known as the Commodore Waste Rock Pile ("CWRP")

located near the portals of the Nelson Tunnel and the Commodore No. 5 Tunnel.

5. Different mining companies constructed the Nelson Tunnel in three phases between 1892 and 1902 for the purposes of locating ore, haulage, and dewatering mines as an alternative to pumping water to the surface of mine shafts. The portal of the Nelson Tunnel is situated on the Tunnel Annex mining claim. The Nelson Tunnel was eventually abandoned and partially collapsed, but continues to drain mine workings.

6. The Commodore Mining Company constructed the Commodore No. 5 Tunnel, which is part of the Commodore Mine, in the late 1890s. The portal of the Commodore No. 5 Tunnel is situated on the Manhatten mining claim. The Nelson Tunnel and Commodore No. 5 Tunnel adits generally follow the same course far into the mountainside, with Commodore No. 5 Tunnel located approximately 200 vertical feet above the Nelson Tunnel. The Commodore No. 5 Tunnel was used for exploration, mining, and haulage of waste rock and ore through the 1980s.

7. Excavation of the Nelson Tunnel and Commodore No. 5 Tunnel, and mining operations conducted through the Commodore No. 5 Tunnel until the 1980s, contributed to the CWRP. By the 1980s a large quantity of mine dump material had been cast into the West Willow Creek drainage below the Commodore No. 5 Tunnel portal, and construction of the CWRP had altered the natural stream channel. As described in a Preliminary Reclamation Workscope and Cost Estimate – Creede Silver Project prepared for Mesa Limited Partnership (formerly Pioneer Nuclear Inc.) by Steffen Robertson & Kirsten, mining and environmental consulting engineers dated November 1, 1988 (hereinafter the "SRK Memorandum"):

> The natural stream channel gradient in this area is covered by mine dump material and is presumably quite steep. Water enters the area covered by mine dump material in the natural channel and then is routed through the waste rock using a wooden flume. The flume maintains flow [of West Willow Creek] at a level above the base of the natural stream channel. The flume eventually discharges into a seven-ft diameter steel pipe which subsequently discharges into the natural stream channel.

The wooden flume and steel pipe described in the SRK Memorandum will be referred to herein as the "CWRP Water Conveyance System."

8. The SRK Memorandum described the wooden flume portion of the CWRP Water Conveyance System as follows:

> The wooden flume utilizes crib-wall type construction with a lined wooded bottom. The mine dump material retained behind the flume had been shifting due to internal stresses. The magnitude of this movement has been monitored previously by MESA personnel. The net magnitude of movement is shown on Table 1. The points at which these measurements were made are shown on Figure 3. As indicated by the figure, the flume is moving within the lower most portions. Without continual rehabilitation of the flume throughout its entire length, and slope stabilization, the flume will eventually fail.

### DEFENDANT, ITS JOINT VENTURE WITH PIONEER, AND DEFENDANT'S RELATIONSHIP TO THE SITE

9. Minerals Engineering Company ("MECO") is a corporation organized under the laws of Colorado in 1948.

10. In 1986, CoCa Mines, Inc., a corporation organized under the laws of Colorado in 1982, merged with and into MECO (the "1986 merger"). Although MECO was the surviving corporation, following the 1986 merger MECO changed its name to CoCa Mines, Inc. MECO, now known as CoCa Mines, Inc., is the Defendant in this action ("Defendant"). For clarity, in referring to Defendant's activities that occurred before the 1986 merger the Defendant will be referred to as "MECO," and in referring to Defendant's activities that occurred after the 1986 merger the Defendant will be referred to as "CoCa Mines."

11. Before the 1986 merger, MECO entered into a Mining Lease with the owners of numerous mining properties in the Creede Mining District which included 78 patented lode or possessory claims and covered 1,284 acres (the "mining properties"). The mining properties comprised several historic silver mines in an area referred as the "Creede Underground" drained

by the Nelson Tunnel and accessed primarily by the Commodore No. 5 Tunnel.  The mining properties included the Manhatten (MS No. 7460), Tram (MS No. 11970), Senora (MS No. 7672), and Tunnel Annex (MS No. 9791A) mining claims upon which the CWRP was located.  The Mining Lease was effective from January1973 through January 1993.

12. The Mining Lease gave MECO the right to explore, prospect, develop, mine, store, remove, sell, or otherwise deal with ore, materials, and minerals on the mining properties.  In exchange for having control over the mining properties, the Mining Lease provided that MECO was responsible for all claims, demands, or liabilities arising from its mining related activities on the mining properties.  The Mining Lease required MECO to pay:  a royalty to the owners; the full amount of all ad valorem taxes assessed upon the production or severance of ore from the mining properties; one-half of the amount of ad valorem taxes assessed upon the non-producing mining properties; and all taxes on personal property and improvements MECO placed on the mining properties.

13. MECO conducted mining operations in the Creede Underground as the de facto owner of the mining properties covered by the Mining Lease, including engaging in exploration and production work and subleasing the mining properties to another company to facilitate further exploration and development work pursuant to a joint agreement.

14. From roughly January 1973 through October 1976 MECO conducted mining operations in the Creede Underground, including rehabilitating and developing mine workings, advancing cross-cuts, replacing haulage tracks, and mining silver ore from portions of the Amethyst, OH, and P veins in the Creede Underground.  MECO hauled waste rock and ore out the Commodore No. 5 Tunnel, and used the CWRP for disposal of waste rock or low grade ore associated with those mining operations.  During the period of MECO's mining operations in the

Creede Underground, the Nelson Tunnel continued to drain the mine workings and discharged mine drainage into West Willow Creek.

15. From 1983 through 1989 MECO, later known as CoCa Mines, was a joint venture partner of Pioneer Nuclear, Inc., ("PNI") and PNI's successors-in-interest including Mesa Limited Partnership ("MLP"), and its operating affiliate, Mesa Operating Limited Partnership ("MOLP").

16. MECO entered into an Exploration Agreement and Option ("Exploration Agreement") with PNI dated September 9, 1982. Among other things, the Exploration Agreement gave PNI the right to conduct mine exploration activities on the mining properties controlled by MECO pursuant to the Mining Lease described above in Paragraph 11 (the "MECO Property"), and granted PNI the option to enter into a joint venture with MECO for the joint development and production from the MECO Property and acquire 55% of MECO's interest in the MECO Property (later increased to 57%).

17. PNI exercised its option under the Exploration Agreement to enter into a joint venture with MECO. On June 1, 1983, PNI and MECO entered into a joint venture agreement titled "Development and Operating Agreement" (the "Joint Venture Agreement"). The purpose of Joint Venture Agreement was to provide operations on the MECO Property, "including, without limitation, the development of any and all ore and minerals existing in the [MECO] Property in commercial quantities; mining, extraction, and processing such ore and minerals; and the conduct of all work, construction, operations, and activities incidental, necessary, or convenient for the above, all for the Joint Account of the parties hereto." Joint Venture Agreement, Art. 1.

18. PNI was designated as the "operator" under the joint venture, having the

"exclusive rights to manage and conduct development, exploration, construction, mining, milling, and all other operations on or pertaining to the [MECO] Property, and shall have full and exclusive control of the operations, the [MECO] Property, and all assets and property of the Joint Account, subject to all the terms of this Agreement."  Joint Venture Agreement § 9.1.  PNI, as the "operator" of the Joint Venture, was required to prepare a "Development Plan" to bring the Property into production, and submit it to MECO as the "non-operator."  Joint Venture Agreement § 6.1.

19. PNI prepared a Development Plan for the joint venture dated August 30, 1983 and submitted it to MECO.  The Development Plan included "Preparatory Activities" to occur from September 1983 through April 1984.  Those activities included stabilizing the CWRP so that the surface area abutting the portal of the Commodore No. 5 Tunnel could be used as a work area for rail cars to unload ore and waste rock hauled out of the Commodore No. 5 Tunnel, load trucks staged in a loading area beneath a crib wall supporting the work area by way of an existing chute, and dump waste rock over the side of the CWRP.

20. PNI prepared monthly "Creede Project Development Project Reports" and periodic updates for MECO describing work PNI completed on behalf of the joint venture.  The periodic reports documented that the ""Preparatory Activities" work described in the preceding paragraph had been completed on the CWRP, and that the Commodore No. 5 Tunnel had been enlarged to accommodate larger drilling equipment, tunnel cave-ins had been mucked out, and the Peak Drift was extended by a length of roughly 800 feet.  Extending the Peak Drift alone would have generated approximately 4,000 tons of waste rock disposed of on the CMRP.

21. Following a series of restructurings and reorganizations, Mesa Limited Partnership ("MLP") became the owner of PNI's interest in the MECO Property described in

Paragraph 16 above.  MLP also assumed all liabilities of PNI.  MLP subsequently transferred or agreed to transfer such interests to MOLP, and MOLP assumed or agreed to assume the related liabilities.  MLP and MOLP ("MLP/MOLP") acted as the operator of the joint venture under the Joint Venture Agreement with MECO from July 1986 until the joint venture was terminated on or about October 6, 1989 as discussed below.

22. During the period of time from on or about July 1, 1986 through October 6, 1989, MLP/MOLP, as operator of the joint venture, engaged in mining or related activities affecting the CWRP.   Among other things, MLP/MOLP removed approximately 2,246 tons of ore from the Amethyst No. 5 level resulting in the disposal of a now unknown amount mine waste on the CWRP, and the disposal of an estimated 500 tons of mine waste on the CWRP due to the rehabilitation of the portal of the Commodore No. 5 Tunnel in 1986.

23. A 1986 Annual Report by PNI to CoCa Mines documented that "[i]t was mutually decided by Pioneer/MECO representatives that a new portal should be installed (due to a cave-in at the Commodore No. 5 Portal), as well as the completion of some badly needed flume and creek-related repairs."  More details were provided in a Progress Report for the period from July 1, 1986 to December 31, 1986 as follows:

> There "were some badly needed repairs in West Willow Creek immediately adjacent to the Commodore No. 5 Mine Dump. . . . The problem concerned the wooden flume and possible creeping of the mine dump through which West Willow Creek flows.  These hazards were brought to the attention of Pioneer/Mesa by local MECO employees.   It was mutually agreed that repairs would be done in 1986 to insure a safe run-off during the spring of 1987, and that Mesa would monitor the dump on a regular basis to check for movement.  A solution will be sought once and if movement of the dump has been established.

By February 1987 MLP/MOLP had installed survey points and monitored the creep of the CWRP on a monthly basis through the summer of 1989.  MLP/MOLP also periodically conducted maintenance of, and repairs to, the CWRP Water Conveyance System.

24.     As described in Paragraph 7, MLP/MOLP retained a consultant to evaluate the condition of the CWRP and the requirements of the Colorado Mined Land Reclamation Act. The SRK Memorandum, dated November 1, 1988, stated that the reclamation requirements included removing the wooden flume, excavating a trench through the waste rock and re-establishing a natural stream channel, re-grading the CWRP to establish final slopes with adequate stability to prevent failures which could dam the stream, and constructing a small overflow embankment further down West Willow Creek with sufficient detention time to settle out colloidal particles of mine waste in the stream.  SRK estimated the costs of that work at $300,000.  MLP/MOLP did not complete any of this reclamation work before it abandoned the Site and terminated the joint venture with CoCa Mines in October 1989 as described in the next Paragraph.

25.     MOLP entered into a Purchase and Sale Agreement with CoCa Mines and Creede Resources, Inc. ("CRI"), a wholly-owned subsidiary of CoCa Mines, dated October 6, 1989. Pursuant to the Purchase and Sale Agreement MOLP sold its undivided interest in the MECO Property and the joint venture described above to CoCa Mines and CRI in exchange for which, among other things, CoCa Mines and CRI agreed to be responsible for the reclamation of the CWRP and all environmental liabilities at the Site.  Neither CoCa Mines nor CRI completed any of the reclamation work described above before CoCa Mines abandoned the Site.

26.     Hecla Mining Company, the parent corporation of CoCa Mines, terminated the Mining Lease described in Paragraph 11 above on or about January 28, 1993.  A few years later the CWRP Water Conveyance System failed, and the CWRP collapsed into West Willow Creek. Washout from the failure of the CWRP Water Conveyance System and erosion of the CWRP released mine waste contaminated with heavy metals, including arsenic, cadmium, lead,

manganese, and zinc, into West Willow Creek. West Willow Creek drains into Willow Creek, which flows into the Rio Grande River roughly four miles below the Site.

## RESPONSE ACTIONS

27. Sections 104(a) and (b), and 107 of CERCLA, 42 U.S.C. §§ 9604(a) and (b), and 9607, authorize the President to determine the existence and extent of the release or threatened release of hazardous substances; take action to remove or remedy such releases in order to protect the public health or welfare or the environment; and to recover the costs of these actions.

28. The discharge of acid mine drainage from the Nelson Tunnel, as well as the failure of the CWRP Water Conveyance System, collapse of the CWRP, and erosion of mine waste from the CWRP, released and threatened the release of arsenic, cadmium, lead, manganese, and zinc which are "hazardous substances" hazardous substances into the environment within the meaning of Sections 101(8), (14), and (22), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(8), (14), and (22), and 9607(a). EPA regulations list these substances as hazardous at 40 C.F.R. § 302.4(a) and Table 302.4.

29. On September 3, 2008, EPA placed the Site on the National Priorities List pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and as set forth at 40 C.F.R. Part 300, Appendix B. See 73 Fed. Reg. 51368 (Sept. 3, 2008). To manage the environmental cleanup at the Site, EPA designated the CWRP as operable unit 1 ("OU1"), and the Nelson Tunnel as operable unit 2 ("OU2").

30. During 2008 and 2009 EPA conducted a removal action at OU1 to stabilize the CWRP and construct a clean rip rap channel to convey West Willow Creek around the CWRP. The work EPA completed is described in a Removal Summary and As-Built Report dated May 5, 2010, and a final POLREP #1 (pollution report) dated August 23, 2012.

31. EPA completed a Remedial Investigation Report for the Site dated November 2011 (the "RI Report"). EPA is in the process of completing a Feasibility Study ("FS") of remedial options for the Site. EPA has not completed an FS in part because remedial options for OU2 (Nelson Tunnel), may substantially differ depending upon whether a mine up gradient of the Site, known as the Bulldog Mine, is dewatered for future mining operations which may affect the water table in mine workings connected with the Nelson Tunnel.

32. Through June 30, 2015, EPA incurred a total of nearly $10 million in response costs at the Site. Of this sum, roughly $5.4 million is attributable to the removal action completed at the CWRP (OU1), $2.1 million is attributable to the on-going investigation of the Nelson Tunnel (OU2), and $5.4 million is attributable to general site-wide matters equally applicable to both OU1 and OU2. A portion of the response costs EPA incurred for OU2 were funded by the Asarco Environmental Trust.

33. Pursuant to Section 104(c)(3) of CERCLA, 42 U.S.C. § 9604(c)(3), CDPHE is required to and will pay or assure the payment of 10% of the costs of future remedial actions, as defined by Section 101(24) of CERCLA, 42 U.S.C. § 9601(24).

## CLAIM FOR RELIEF

34. The allegations contained in paragraphs 1 through 33 are realleged and incorporated herein by reference.

35. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that, inter alia, the following persons shall be liable under CERCLA for the costs incurred by the United States and the State in responding to the release or threatened release of hazardous substances: any person who owned or operated any facility at the time hazardous substances were disposed of.

36. The CWRP and the Nelson Tunnel are each a "facility" within the meaning of

11

Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

37.     Section 101(29) of CERCLA, 42 U.S.C. § 9601(29), provides that the term "disposal" shall have the meaning provided in Section 1004 of the Solid Waste Disposal Act (as amended by the Resource Conservation and Recovery Act, "RCRA"), 42 U.S.C § 6903.  Section 1004(3) of RCRA, 42 U.S.C. § 6903(3), provides, inter alia, that the term "disposal" includes the "discharge, deposit, . . . dumping, . . . or placing of any solid or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be . . .  discharged into any waters, including ground waters."  Section 1004(27) of RCRA, 42 U.S.C. § 6903(27) provides, inter alia, that the term "solid waste" includes any "discarded material . . . resulting from mining operations . . . ."

38.     From January 1973 through January 1993, Defendant was an "owner" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), at the time of disposal of hazardous substances at the CWRP and from the Nelson Tunnel.

39.     Defendant was an "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), at the time of disposal of hazardous substances at the CWRP and from the Nelson Tunnel.  From January 1973 through June 1, 1983, Defendant was an "operator" because of its activities at the Site described above.  From June 1, 1983, when Defendant entered into the Joint Venture Agreement with PNI, through October 6, 1989, when MECO purchased all of the "right, title, and interest" of Mesa (successor to PNI) in all the property covered by the Joint Venture Agreement and in the joint venture, MECO was an "operator" because PNI's activities at the Site described above were attributable to MECO.

40.     Defendant, known as MECO before the 1986 merger and as CoCa Mines after the 1986 merger, and the joint venture of MECO and PNI from June 1, 1983 through October 6,

1989, are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

41. There were "release[s]" of hazardous substances at or from the Site, including the CWRP and the Nelson Tunnel, within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

42. The actions taken by the EPA and CDPHE in connection with the Site, including the CWRP and the Nelson Tunnel, constitute "response" actions within the meaning of Section 101(25) of CERCLA, 42 U.S.C. § 9601(25). As a result of EPA's response actions, the United States has incurred unreimbursed response costs, as defined in Sections 101(25) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(25), 9607(a).

43. Such costs include the costs of all activities taken at the Site pursuant to Section 104(b) and (e) of CERCLA, 42 U.S.C. § 9604(b) and (e), including but not limited to the costs of performance of the removal action at the Site, together with prejudgment interest, as provided for by Section 107 of CERCLA, 42 U.S.C. § 9607. These costs also include enforcement costs incurred and to be incurred in connection with the Plaintiffs' efforts to recover its response costs from liable parties.

44. Pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, responsible parties are liable for "all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan [40 C.F.R. Part 300]." 42 U.S.C. § 9607(a)(4)(A).

45. The response actions taken by EPA and CDPHE with respect to the Site, including the CWRP and the Nelson Tunnel, and the costs incurred in connection with those response actions are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

response actions are not inconsistent with the National Contingency Plan, 40 C.F.R. Part 300.

46.  Pursuant to Sections 107(a)(2) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9607(a)(2) and 9613(g)(2), Defendant is liable to the Plaintiffs for all unreimbursed costs, including administrative, investigative, and enforcement costs that the United States and the State have incurred, are incurring, or will incur in connection with the response actions taken at the Site.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs the United States and the State pray that this Court:

A.  Enter judgment in favor of the United States and against Defendant pursuant to Section 107(a)(2), 42 U.S.C. § 9607(a)(2), for all unreimbursed response costs Plaintiffs have incurred in connection with response actions relating to the Site, including the CWRP and the Nelson Tunnel, including prejudgment interest on those sums;

B.  Enter judgment in favor of the United States and the State against the Defendant pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), as to its liability for response costs that will be binding in any subsequent action or actions by the Plaintiffs against Defendant to recover any further response costs related to the Site, including the CWRP and the Nelson Tunnel;

C.  Award the United States and the State their costs and expenses for this action; and

D.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

14

_____
JEREL ("JERRY") L. ELLINGTON
JOSH VAN EATON
TRIAL ATTORNEYS
Environmental Enforcement Section
United States Department of Justice
999 18th Street, South Terrace, Ste. 370
Denver, Colorado  80202
(303) 844-1363


Of Counsel:

LAURIANNE JACKSON
Enforcement Attorney
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street (8ENF-L)
Denver, CO 80202-1129


                                CYNTHIA COFFMAN
                                Colorado Attorney General
                                State of Colorado

                                _____
                                JASON KING
                                Senior Assistant Attorney General
                                State of Colorado
                                Colorado Department of Law
                                1300 Broadway, 7th Floor
                                Denver, CO 80203
                                (720) 508-6283